FILED

2013 Jan-22  PM 05:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **CYNTHIA RICHTER,** *on behalf of herself and others similarly situated,* | ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Civil Action 7:06-cv-01537-LSC** ) |
| **DOLGENCORP, INC., DOLGENCORP OF NEW YORK, DOLGENCORP OF TEXAS, and DOLLAR GENERAL PARTNERS,** | ) **Plaintiffs Request Oral** ) **Argument** ) ) |
| **Defendants.** | ) |

## Motion to Reconsider Decertification Order and Request for Oral Argument

Cynthia Richter moves the Court to set aside its order granting Dollar General's decertification motion, as Richter shares sufficient similarities with the opt-in plaintiffs to utilize the Fair Labor Standards Act of 1938's[1] ("FLSA") opt-in provision.[2] While working as a Dollar General store manager, Richter spent the majority of her time performing manual-labor

---

[1] 29 U.S.C. § 201 *et seq.*

[2] *See id.* § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.").

duties, had pay similar to nonexempt employees, and always answered to a higher authority—all of which were essential to Dollar General's success. Months of discovery demonstrated that the opt-in plaintiffs had the same experience as Richter. The overarching issue is whether, despite minor differences, the jobs of Richter and the opt-in plaintiffs shared a similar character or essential nature so that the Court may adjudicate their claims in a single action.

In its decertification opinion, the Court pointed to certain differences among Richter and the opt-in plaintiffs to support its decision. But mere differences are not enough. For an employer to avoid a collective action, there must be a certain amount of differences that are "legally significant."[3]

There are not enough differences present to have an influence on the primary-duty analysis, and thus not enough differences to cause some opt-in plaintiffs to have a primary duty of management and others to have a primary duty of nonmanagement. The Court need not look any further than the two opt-in plaintiffs that Dollar General singled out in its motion, Thomas Zingale and Kendra Stewart. Held out as polar opposites, the comparison of Zingale

---

[3] *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008) ("In *Anderson*, we again refused to draw bright lines in defining similarly, but explained that as more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." (*citing Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007))).

and Stewart was Dollar General's shining example of why a collective action was improper.

Yet upon close inspection, Zingale and Stewart do not look very different at all, because employees are viewed in the macro, not in the micro. There are differences between the two employees for sure, but those differences are not enough to create a distinction between the characters of the two employees' jobs. Both spent the majority of their time performing manual-labor duties, both worked in stores with insufficient labor budgets, both earned pay similar to other store employees, and both were integral to Dollar General's low-price business model that required lean store staffing.

And it is for these and other reasons—articulated in Richter's response to Dollar General's decertification motion—that Richter humbly asks the Court to reconsider its decertification decision. Because the differences that concerned the Court in its opinion would not influence the ultimate primary-duty decision—i.e., the differences are not legally significant—it is necessary for the Court to reconsider its order, which it has the inherent authority to do.[4]

---

[4] *See Fernandez-Vargas v. Pfizer Pharm., Inc.*, 522 F.3d 55, 61 n. 2 (1st Cir. 2008) ("While the Federal Rules do not provide for a 'motion to reconsider,' a district court has the inherent power to reconsider its interlocutory orders, and we encourage it to do so where error is apparent." (*citing Warren v. Am. Bankers Ins. of Fla.*, 507 F.3d 1239, 1243 (10th Cir. 2007))); *Rueter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 440 F. Supp. 2d 1256, 1267 (N.D. Ala. 2006) ("A district court has plenary power over an interlocutory

## Summary of Response in Opposition to Decertification Motion

In 1995, long before the vast majority of opt-in plaintiffs were employed by Dollar General, the company made the decision that from that point forward, it would deny overtime pay to all of its store managers. The company never wavered. And in the nearly two decades that followed, it never reviewed the soundness of its decision, save for a revealing survey conducted in 2004, which remarkably the Vice President of Store Operations still has not seen. The result of Dollar General's single decision was tens of thousands of store managers denied overtime compensation, wrongfully in our view.

Richter and the opt-in plaintiffs submitted an extensive brief articulating many reasons why they should be able to proceed collectively, including:

- The opt-in plaintiffs shared the same 14 significant job factors as the opt-in plaintiffs in *Family Dollar* did, which led the Eleventh Circuit to conclude that the plaintiffs had a "heightened similarity."[5]

- Dollar General's low-price business model limits the company's ability to pass along labor costs to consumers, requiring it to operate its stores under a "lean store-staffing model."

---

order and the power to reconsider, revise, alter or ament it." (*citing Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000))).

[5] *See* Doc. 325, Pls.' Resp. Opp'n Defs.' Mot. Decertify Collective Action, pp. 15–23.

- Nearly 96% of the opt-in plaintiffs worked on average more than 50 hours a week, despite the Vice President of Store Operations testifying that a store manager working more than 50 hours a week suggested that there was a problem.

- Every trial and deposed plaintiff that submitted signed written discovery indicated that the store they worked in operated with an insufficient labor budget.

- The two opt-in plaintiffs singled out by Dollar General as being complete opposites—Thomas Zingale and Kendra Stewart—look extremely similar.[6]

**Fourteen Factors.** Based on 14 significant job factors that the opt-in plaintiffs in *Family Dollar* shared, the Eleventh Circuit concluded that the decision to deny decertification was not even a close call. The court noted that the opt-in plaintiffs had a heightened similarity because of the factors, all of which are present in this case. From Dollar General's decision to universally classify all store managers to the opt-in plaintiffs' inabilities to select outside vendors for stores, and every factor in between, if the Court only relied on the 14 factors from *Family Dollar*, it would be compelled to reach the same conclusion as the Eleventh Circuit—a collective action is appropriate.

**Lean Store-Staffing Model.** Dollar General's low-price business model constrains the company's ability to pass along labor costs to customers.[7] So

---

[6] *See* Doc. 325, Pls.' Resp. Opp'n Defs.' Mot. Decertify Collective Action, pp. 47–51.

Dollar General must operate under what it refers to as a "lean store-staffing model."[8] Stores are operated with minimal employees and minimal labor hours. This means store managers work excessive hours performing large amounts of manual-labor duties, and are often in the stores alone.

**Working More Than 50 Hours.** Dollar General's Vice President of Store Operations testified that a store manager should not have to work more than 50 hours a week, and suggested that doing so meant that a problem existed in the store.[9] Yet nearly 96% of all store managers worked on average 51 hours or more each week[10]—no doubt the result of insufficient labor budgets.

**Insufficient Labor Budgets.** Every trial and deposed plaintiff that submitted signed written discovery indicated that the store they worked in operated with an insufficient labor budget. This fact is supported by the nearly 96% of opt-

---

[7] *See* Doc. 325-31, Ex. 5, Dollar General's Form 10-K for Period Ending Jan. 29, 2010, at 15.

[8] *See* Doc. 325-31, Ex. 5, Dollar General's Form 10-K for Period Ending Jan. 29, 2010, at 3 ("Our lean store staffing model contributes to our relatively low operating costs and efficient store operations.").

[9] *See* Doc. 318-4, Defs.' Ex. 302, Bass Dep. 304:2–13 (stating that it should take store managers 45–50 hours a week to accomplish their tasks).

[10] *See* Docs. 325-15–325-27, Ex. 1, Declarations (out of 2,960 declarations, only 124 plaintiffs stated that they worked on average 50 hours a week or less); This does not include plaintiffs who no longer wish to pursue their claims, plaintiffs that were part of the *Brown* or *Gray* matters, or plaintiffs who have not submitted a signed declaration. (*See* Doc. 325-14, App. N, Declaration Status.).

in plaintiffs that worked on average more than 50 hours a week and Dollar General's admission that it has trouble passing along labor costs to consumers.

**Thomas Zingale and Kendra Stewart.** Although singled out by Dollar General as opposites, the facts that Zingale and Stewart share far outweigh any minor differences:

- Both worked well in excess of 50 hours each week—Zingale up to 60 hours,[11] Stewart up to 70 hours.[12]

- Both worked in stores with insufficient labor budgets.[13]

- Both spent the vast majority of their time performing nonmanagerial duties (first primary-duty factor).[14]

- Both performed significant nonmanagerial duties, and those were the most important duties that they performed due in large part to Dollar General's business model (second primary-duty factor).[15] (Although Dollar General would disagree with this analysis, it would argue that both performed significant managerial duties, and that those were the most important duties that both performed.)

---

[11] Doc. 325-27, Ex. 1, part 13, Zingale Decl. ¶ 4.

[12] Doc. 325-25, Ex. 1, part 11, Stewart Decl. ¶ 4.

[13] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 203:2–5 (stating that she thought the store's labor budget was insufficient); Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 173:22–174:2 (stating that the store's labor budget was not large enough).

[14] *See* Doc. 325-25, Ex. 1, part 11, Stewart Decl. ¶ 3 (stating that she spent approximately 85% of her time performing manual-labor duties); Doc. 325-27, Ex. 1, part 13, Zingale Decl. ¶ 3 (stating that he spent approximately 85% of his time performing manual-labor duties); Doc. 310-31, Stewart Dep. 194:18–195:3 (stating that she spent 85% of her time performing manual-labor duties); Doc. 311-21, Zingale Dep. 72:7–16 (stating that he might have spent 30% of his time performing managerial duties).

[15] *See* Doc. 325, Pls.' Resp. Opp'n Defs.' Mot. Decertify Collective Action, Part 4.

- Both lacked authority over matters of significance, and thus both were under heavy supervision (third primary-duty factor):

    o Both worked in stores operated based on the same lengthy standard operating procedures manuals.[16]

    o Both lacked the authority to set initial pay rates for new employees.[17]

    o Both lacked the authority to give an employee a pay raise.[18]

    o Both lacked the authority to terminate employees.[19]

    o Both lacked the authority to contract with outside vendors.[20]

    o Both lacked the authority to transfer merchandise in or out of the stores.[21]

    o Both lacked any input over the stores' hours of operation.[22]

    o Both lacked the authority to control the stores' temperatures.[23]

---

[16] *See* Doc. 318-7, Defs.' Ex. 305, Rice Dep. 50:12–18 (stating that all stores have the same standard operating procedures manual).

[17] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 196:22–197:2; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 164:21–165:4.

[18] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 197:3–6; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 165:6–9.

[19] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 165:8–12; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 26:14–27:1.

[20] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 197:7–10; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 168:19–22.

[21] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 198:3–13; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 169:6–10.

[22] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 199:16–18; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 169:21–170:2.

- o Both had to receive district-manager approval prior to using their vacation time.[24]

- o Both were subject to in-store visits from their district managers.[25]

- o Both received voicemails from their district managers almost daily.[26]

- o Both worked in stores that Dollar General controlled the vast majority of decisions related to the selection, pricing,[27] and layout of store merchandise.[28]

- Both had earnings comparable to their stores' assistant store managers (fourth primary-duty factor).

   - o Zingale earned as little as $1[29] more per hour than the assistant store manager.[30]

---

[23] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 199:19–21; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 170:14–19.

[24] *See* Doc. 310-31, Defs.' Ex. 182, Stewart Dep. 199:22–200:1; Doc. 311-21, Defs.' Ex. 206, Zingale Dep. 170:20–23.

[25] *See* Doc. 318-4, Ex. 302, Bass Dep. 297:20–298:2 (stating that a district manager may review the merchandise-receiving process when they visit a store); Doc. 318-4, Ex. 302, Bass Dep. 299:2–6 (stating that a district manager may review the in-stock process when they visit a store).

[26] *See* Doc. 310-31, Stewart Dep. 145:2–10; Doc. 311-21, Zingale Dep. 176:1–3.

[27] *See* Doc. 318-4, Defs.' Ex. 302, Bass Dep. 362: 24–363:7 (discussing how in 2003, items sold in different states would have the same pricing); Doc. 318-4, Defs.' Ex. 302, Bass Dep. 415:17–22 (discussing how there was a point in time in which Dollar General focused on having even-dollar price points for its merchandise); Doc. 318-4, Defs.' Ex. 302, Bass Dep. 373:26–374:3 (noting that vast majority of noncore merchandise goes to each store with pricing already on it).

[28] *See* Doc. 318-4, Defs.' Ex. 302, Bass Dep. 267:24:268:2 (discussing how Dollar General has a department that is responsible for developing planograms for all stores).

[29] $600 salary / 60 hours a week = $10 per hour; $10 - $9 = $1.

**Motion to Reconsider Decertification Order**                                                                          **9**
**and Request for Oral Argument**

- Stewart earned as little as $0.58[31] more per hour than the assistant store manager.[32]
- The Eleventh Circuit in *Family Dollar* considered a difference in pay between the store manager and the assistant store manager of $2–$3 insignificant.[33]

- Both operated under the same job description.[34]

- Both operated under the same bonus plans.

- Both had their performances evaluated using the same or similar performance-evaluation categories.

- Dollar General would argue that both were the highest-level personnel assigned to the stores. (Although the plaintiffs note that in fact the district manager is the highest-level personnel assigned to a store.)

- Dollar General would argue that both were responsible for training employees, resolving customer-service issues, and implementing company policies and procedures.[35]

---

[30] *Compare* Doc. 311-21, Zingale Dep. 16:7–10 (stating that his starting salary was $600 a week), *with* Doc. 311-21, Zingale Dep. 148:20–22 (stating that an assistant store manager earned up to $9 an hour).

[31] $550 salary / 70 hours = $7.86; $7.86 - $7.28 = $0.58.

[32] *Compare* Doc. 310-31, Stewart Dep. 64:12–15 (stating that her starting salary was $550 a week), *with* Doc. 310-31, Stewart Dep. 107:8–10 (stating that the assistant store manager earned $7.28 per hour).

[33] *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1271 ("Using a 60-hour workweek, store managers earned approximately two or three dollars more per hour than hourly assistant store managers. . . . Given the relatively small difference between the store managers' and assistant managers' hourly rates, it was within the jury's province to conclude that this factor either did not weigh in Family Dollar's favor or at least did not outweigh the other factors in Plaintiffs' favor.").

[34] *See* Doc. 318-7, Defs.' Ex. 305, Rice Dep. 49:16–23 (stating that all store managers operate under the same job description regardless of which store they work in).

[35] *See* Doc. 313-1, Defs.' Ex. 230, Store Manager Job Description.

---

- Both shared managerial duties with their stores' assistant store managers.[36]
- Both received a fixed salary with no overtime pay.[37]

- Both were expected to complete their duties within 45–50 hours a week.[38]

In sum, in addition to sharing the 14 significant job factors from *Family Dollar*, all opt-in plaintiffs share the same primary duty. Based on Eleventh Circuit precedent (with facts that are virtually identical to those in this case), the nature of the executive exemption, Dollar General's business model, and Dollar General's own actions and beliefs, the Court should reconsider its decertification order and conclude that this action should proceed collectively.

### Reasons to Reconsider Decertification Order

When analyzing a decertification motion, courts consider three factors: (1) dissimilar factual and employment settings of the plaintiffs; (2) individual

---

[36] *See* Doc. 313-2, Defs.' Ex. 231, Assistant Store Manager Job Description (supervising store employees, efficiently manage the store's inventory, ensure a safe working environment, provide for the protection of company assets, authorize refunds, make bank deposits, ensure adherence to company security practices, schedule employees, submit payroll, train employees, review operating statements, conduct safety meetings, ensure that store employees comply with the company's policies and procedures).

[37] *See* Doc. 318-7, Defs.' Ex. 305, Rice Dep. 51:25–52:10 (stating that store managers are paid on a salary basis).

[38] *See* Doc. 318-4, Defs.' Ex. 302, Bass Dep. 304:2–13 (stating that it should take store managers 45–50 hours a week to accomplish their tasks).

defenses available to the employer; and (3) fairness to the employer. [39]   For the differences among the plaintiffs to be material, they must be "legally significant."[40]

The Eleventh Circuit's decision in *Morgan v. Family Dollar Stores, Inc.*[41] should guide this Court's analysis in determining whether the differences among Richter and the opt-in plaintiffs are legally significant. The court in *Family Dollar* identified 14 significant job factors that led it to conclude that ample evidence supported the district court's decision to allow a collective action to proceed.[42] Richter and the opt-in plaintiffs too share these 14 significant job factors, and other factors further show that the plaintiffs are factually similar.

In its memorandum, the Court did not disagree that the 14 *Family Dollar* factors are present. Instead, the Court distinguished *Family Dollar*, concluding that if the district court had decertified the action, the Eleventh

---

[39] *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1261 (*citing Anderson v. Cagle's, Inc.*, 488 F.3d at 953).

[40] *See id.* ("In *Anderson*, we again refused to draw bright lines in defining similarly, but explained that as more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." (*citing Anderson v. Cagle's, Inc.*, 488 F.3d at 953)).

[41] 551 F.3d 1233.

[42] *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1262–63 (discussing 14 significant job factors that the plaintiffs shared).

Circuit might have also supported that decision.[43] But in fact the Eleventh
Circuit did suggest that a contrary ruling would have been unsound and
unreasonable by explicitly stating that the decision to deny decertification was
not even a close call:

> We do not suggest that a collective action needs to have 14
> significant job factors in common in order to be, or stay, certified
> or that less commonality would not have survived a
> decertification motion. Rather, we highlight the number of
> similarities only to show that the decertification decision is not
> close here.[44]

When considering fairness to Family Dollar, the Eleventh Circuit reiterated
that there was no doubt but that the plaintiffs were similarly situated: "Plus,
this is not a case of borderline similarity among the Plaintiffs, but one of
heightened similarity, which significantly adds to our fairness conclusion."[45]

It does necessarily follow that a contrary ruling from the district court in
*Family Dollar* would have been an abuse of discretion. To conclude otherwise
would require a belief that the Eleventh Circuit would have allowed the
district court to decertify the action despite its view that the plaintiffs shared a

---

[43] *See* Doc. 344, Memorandum of Opinion at p. 11 ("First, in affirming the district court's
decision, the Eleventh Circuit in *Morgan* was simply deciding that the district court had
not abused its discretion by finding the multiple plaintiffs similarly situated. It does not
necessarily follow that a contrary ruling would have been an abuse of the district court's
discretion.").

[44] *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1264 n. 45.

[45] *Id.* at 1265 n. 47.

"heightened similarity" that made the decision to deny decertification "not close." This Court's view of *Family Dollar* would be correct had it been a borderline decision. It was not.

The Court further distinguished *Family Dollar* by concluding that this case lacked an abundance of evidence that showed Richter and the opt-in plaintiffs to be similarly situated. But as noted, the plaintiffs in this action shared the same 14 significant job factors as the plaintiffs did in *Family Dollar*, which neither the Court nor Dollar General has refuted. Although the Court notes that the opt-in plaintiffs spent differing amounts of time performing exempt work, minor variations will always occur in these types of cases. In fact, if minor variations were enough to prevent a collective action, it is hard to imagine a class ever going forward. But classes do go forward, like *Family Dollar*, which had a large class of plaintiffs that surely had slight variations in their time estimates.

This case too should go forward as a collective action because the important—and undisputed—fact is that all opt-in plaintiffs spent the majority of their time performing nonexempt work. The Department of Labor regulation establishes a bright-line factor: Is the amount of time that the employee spends on nonexempt work less than or greater than 50%? Because all opt-in plaintiffs exceeded the 50% threshold, they are all sufficiently

similar for purposes of the "time spent" factor. Dollar General has even argued in the past that when an employee spends more than 50% of their time on nonexempt work, the factor becomes irrelevant for purposes of determining their primary duty: "[W]hen the percentage of time spent on 'non-managerial' duties is more than 50%, the 'time spent' factor falls from the equation."[46] Since Richter and all opt-in plaintiffs exceed the 50% threshold, the specific amounts of time that each spent performing exempt work is irrelevant to the decertification decision.

And so are the variations in the types of exempt work that the opt-in plaintiffs may have performed. The ultimate question is whether a Dollar General store manager's main duty is performing management duties or nonmanagement duties.  Since duties are viewed in the aggregate and always classified as either management or nonmanagement, it makes no difference what specific duty an employee performs. It is not the duty, but rather the type of duty that is important.

For example, assume Employee A spent 10% of their time on exempt duties, which included 15 minutes a week filling out the schedule, 1 hour a week completing paperwork, 15 minutes a week submitting payroll, 45

---

[46] *See* Doc. 325-29, Ex. 3 to Pls.' Resp. Opp'n Defs.' Mot. Decertification.

minutes a week making bank deposits, and 1½ hours a week dealing with vendors. Employee B also spent 10% of their time on exempt duties, but spent 10 minutes a week filling out the schedule, 1¼ hours a week completing paperwork, 5 minutes a week submitting payroll, 1 hour a week making bank deposits, and 1¼ hours a week dealing with vendors. While the two employees spent varying amounts of time on their exempt duties, both spent the same amount of time on exempt work. And since employees have either a primary duty of management or a primary duty of nonmanagement—not a primary duty of "completing paperwork" or a primary duty of "stocking shelves"—the variations in the amounts of time spent on specific duties are inconsequential. After all, the issue is the relative importance of exempt duties as a whole compared with nonexempt duties as a whole. Duties must be viewed in the aggregate.

Further, when analyzing the relative importance of managerial duties as compared with nonmangerial duties, Dollar General has consistently argued that this factor's single focus is on what the employer valued.[47] Unless Dollar General valued the managerial duties of some plaintiffs and the

---

[47] *See* Doc. 325-29, Ex. 3, Def.'s Mem. Supp. Mot. Summ. J., p. 13, filed in *Myrick v. Dolgencorp, LLC*, No. 7:09-CV-5 (HL) (M.D. Ga.), Doc. 25-2 (Nov. 2, 2009) ("Thus, the focus must always be on what the employer values, not what the employee subjectively *believes* her employer values.") (emphasis in original).

nonmanagerial duties of others—an argument that it has failed to allege and one which would run counter to its overall argument that all plaintiffs are exempt with a primary (or most important) duty of management—this factor produces a common answer. Using the example above, when evaluating the relative importance of the exempt duties performed by Employee A and Employee B, the Court must reach the same opinion for both employees. Otherwise, the Court would have to assume—contrary to Dollar General's own opinion—that the company valued the exempt duties of one employee and the nonexempt duties of the other. In short, varying amounts of time spent on duties does not affect the decertification analysis.

The decertification analysis also should not be affected by individual analysis of whether opt-in plaintiffs had the authority to hire or fire employees. Except for "floaters"—which Dollar General can easily identify—we conceded that all opt-in plaintiffs could at least make recommendations for hiring or firing. In fact, in the last few years spent responding to Dollar General summary-judgment motions around the country, not once did we ever argue that a store manager lacked the authority to hire store clerks, or at least make recommendations. This was a fact, not disputed by either side, that was held against Richter and the opt-in plaintiffs. And it was an error for the Court to do so.

Based on all of these reasons stated above, the Court erred when it concluded that Dollar General's defenses were individual to each opt-in plaintiff. Not only did Dollar General apply the executive exemption across-the-board—regardless of the factors cited by the Court—but the opt-in plaintiffs shared a number of common job traits. Had the Court concluded that Richter and the opt-in plaintiffs were similarly situated, it would have likely concluded that individual defenses for each opt-in plaintiff did not exist.[48] Thus, if the Court reconsiders whether Richter and the opt-in plaintiffs were similarly situated, it must reconsider whether individual defenses are necessary.

The same is true for the Court's conclusion that allowing a collective action would be unfair. Had the Court concluded that Richter and the opt-in plaintiffs were similarly situated, it would have likely concluded that it would

---

[48] *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1263 ("Given the volume of evidence showing the store managers were similarly situated, and the fact that Family Dollar applied the executive exemption across-the-board to every store manager--no matter the size, region, or sales volume of the store--Family Dollar has not shown clear error in the district court's finding that its defenses were not so individually tailored to each Plaintiff as to make this collective action unwarranted or unmanageable."); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1351 (N.D. Ga. 2002) ("Since the Court has determined that Plaintiffs' job duties were substantially similar, this issue can be adjudicated collectively; therefore, the existence of this defense does not pose any difficulty related to the collective action.").

not be unfair to have a single trial.[49] This is especially true considering Dollar General's single decision to classify all opt-in plaintiffs as exempt, as the Eleventh Circuit found relevant.[50]

In sum, the Court's decision was unsupported by the evidence and contrary to Eleventh Circuit precedent. Because Richter shares sufficient similarities with the opt-in plaintiffs that the characters of their jobs were similar, the Court should set aside its order granting Dollar General's decertification motion.

## Conclusion

We are requesting the Court to change its mind. We believe this to be not only possible, but necessary. And there is a long tradition of great judges that have had second thoughts about a prior opinion, as Justice Jackson once noted when doing an about-face:

> Precedent . . . is not lacking for ways by which a judge may recede from a prior opinion that has proven untenable and perhaps misled others. See Chief Justice Taney, *License Cases*, 5 How. 504, recanting views he had pressed upon the Court as

---

[49] *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d at 1264 ("Indeed, the more similar the employees, the less likely that collectively litigating the executive-exemption issue can be fundamentally unfair.").

[50] *See id.* ("Plaintiffs' evidence established that Family Dollar uniformly exempted all store managers from overtime pay requirements, and its exemption decision did not turn on any individualized factors. Not one. There is nothing unfair about litigating a single corporate decision in a single collective action . . . .").

Attorney General of Maryland in *Brown v. Maryland*, 12 Wheat. 419. Baron Bramwell extricated himself from a somewhat similar embarrassment by saying, "The matter does not appear to me now as it appears to have appeared to me then." *Andrews v. Styrap*, 26 L.T.R., N.S. 704, 706. And Mr. Justice Story, accounting for his contradiction of his own former opinion, quite properly put the matter: "My own error, however, can furnish no ground for its being adopted by this Court . . . ." *United States v. Gooding*, 12 Wheat. 460, 478. Perhaps Dr. Johnson really went to the heart of the matter when he explained a blunder in his dictionary—"Ignorance, sir, ignorance." But an escape less self-depreciating was taken by Lord Westbury, who, it is said, rebuffed a barrister's reliance upon an earlier opinion of his Lordship: "I can only say that I am amazed that a man of my intelligence should have been guilty of giving such an opinion." If there are other ways of gracefully and good-naturedly surrendering former views to a better considered position, I invoke them all.[51]

Richter prays for even one such invocation.

In particular, Richter asks the Court to grant this motion for reconsideration and set aside its decertification order.

## Request for Oral Argument

Counsel for Cynthia Richter and the opt-in plaintiffs respectfully request oral argument on this motion and the decertification issue.

---

[51] *McGrath v. Kristensen*, 340 U.S. 162, 177–78 (1950) (Jackson, J., concurring).

Respectfully submitted,


_/s/ C. Lance Gould_____
C. Lance Gould
ASB-0913-G66C
**Beasley, Allen, Crow,**
 **Methvin, Portis & Miles, P.C.**
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343
(334) 954-7555 (fax)
Lance.Gould@BeasleyAllen.com

P. Mark Petro
J. Allen Schreiber
**Schreiber & Petro, P.C.**
301 19th St. N., Suite 580
Birmingham, AL 35203
(205) 871-5080
(205) 879-6960 (fax)
ppetro@sppclaw.com
allen@sppclaw.com

_Counsel for Cynthia Richter_
_and the Opt-In Plaintiffs_

## Certificate of Service

A copy of this document was served electronically via the Court's CM/ECF system on January 22, 2013 to the following counsel for the other parties:

Joel S. Allen
Ronald E. Manthey
Melissa M. Hensley
**Morgan, Lewis & Bockius, LLP**
1717 Main St., Suite 3200
Dallas, TX 75201
(214) 466-4106
(214) 466-4001 (fax)
joel.allen@morganlewis.com
ron.manthey@morganlewis.com
melissa.hensley@morganlewis.com

J. Trent Scofield
**Ogletree, Deakins, Nash,**
 **Smoak & Stewart, P.C.**
1819 Fifth Ave. N., Suite 1000
Birmingham, AL 35203
(205) 328-1900
(205) 328-6000 (fax)
trent.scofield@ogletreedeakins.com

Keith D. Frazier
**Ogletree, Deakins, Nash,**
 **Smoak & Stewart, P.C.**
401 Commerce St., Suite 1200
Nashville, TN 37219
(615) 254-1900
(615) 254-1908 (fax)
keith.frazier@odnss.com

*/s/ C. Lance Gould*
C. Lance Gould